TREVINO V. STATE

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-04-119-CR

TOMMY TREVINO APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM THE CRIMINAL DISTRICT COURT NO. 4 OF TARRANT COUNTY

------------

OPINION

------------

Appellant Tommy Trevino appeals his conviction for murder.  In a single point, appellant contends that the evidence is factually insufficient to negate the defensive issue of sudden passion.  We will affirm.

Appellant was tried for the murder of his wife, Michelle Trevino, in the fall of 1999.  A jury found him guilty of murder and sentenced him to sixty years’ confinement.  Appellant appealed his sentence, contending that the trial court erred by failing to instruct the jury on sudden passion.  
Trevino v. State
, 60 S.W.3d 188, 192 (Tex. App.—Fort Worth 2001), 
aff’d, 
100 S.W.3d 232, 239 (Tex. Crim. App. 2003).
  We reversed the trial court and remanded the case for a new trial on punishment.  
Id. at 
195
. 
 The following facts were adduced on retrial.

At the time of her death, the deceased and appellant had been together for about nine years.  Appellant admitted that he had been unfaithful to the deceased during their marriage.
(footnote: 1)  His infidelity had been a source of conflict between them.  For instance, one time when appellant came home with hickeys on his neck, the deceased allegedly pointed a gun at him while he slept.  She told appellant’s brother that she would have shot appellant if he had not been holding their daughter.  Despite their problems, appellant attended family events with the deceased and helped her raise their two children.

About three months before the murder, the deceased told appellant that she wanted a divorce.  After that, appellant started paying more attention to her.  He would take her out to lunch, buy her flowers, and take her to dance clubs, which the deceased enjoyed.  Although their relationship improved for a while, the deceased indicated that they were having problems again just two days before her murder. 

The deceased worked various jobs throughout their marriage.  At the time of her death, she was earning minimum wage, and appellant was unemployed because of neck injuries he sustained in a car accident.  The deceased completed some applications for higher paying jobs, though she did not submit them.  On the day of her murder, however, the deceased told her employer that she had a job interview and arranged to work a later shift.

The State argued that appellant disapproved of the deceased’s plan to find a higher paying job because it would increase her independence and ability to leave him.
(footnote: 2)  According to the State, appellant murdered the deceased because she was going to leave him and he did not want her to be with anyone else.  Appellant disagreed with the State’s proffered motive and testified that he shot the deceased because she shot at him.

According to appellant, he and the deceased were both at home around noon on December 1, 1997.  As appellant sat on his living room sofa watching television, the deceased looked through his wallet and found a woman’s phone number.  She then pointed an empty revolver at him, demanded to know who the woman was, and pulled the trigger twice.  Appellant’s heart “jumped in [his] chest.”  In a state of terror, appellant took a nine millimeter pistol out of the living room closet and went into the bathroom, closing the door behind him.  He used the bathroom and flushed the phone numbers down the toilet.  As he exited the bathroom into the dark hallway, he heard a gunshot “right in front of [his] face.”  At that point, he started shooting and tried to knock the revolver out of the deceased’s hand.  After the shooting, appellant called his sister, who went to his house and then called 911.  She told the operator that appellant shot the deceased with a gun he had taken away from her.

The first police officer to arrive on the scene saw appellant kneeling next to the deceased.  Appellant appeared distraught and told him to help the deceased.  The deceased was lying across the threshold of the bathroom, with her upper body in the bathroom and her legs extended into the hallway.  The officer noticed a revolver lying in the hall.  He asked appellant to move away from the deceased and come towards him; appellant complied.  He was then handcuffed by a second police officer, who led him out of the house.  Both the second officer and firefighters passing appellant as they entered the house testified that he looked calm.

Emergency personnel determined that the deceased was not breathing and did not have a pulse or heartbeat.  The condition of her body led them to believe that she had “been down for a while.”  The deceased was pronounced dead at the scene.

The deceased had a total of six bullet wounds.  The first bullet entered her left hip and exited through her right buttock, the second bullet entered the left side of her head and exited through the right side of her head, and the third bullet entered the center of the front of her chest and exited through her back.  A blood smear on the hallway wall was consistent with the exit wound from the hip shot and indicated that the deceased had slid down against the wall to the floor.  Although the deceased could have continued to struggle after the first shot, the shot to her head would have caused immediate shock and rendered the deceased incapable of any volitional movement.  The lack of bleeding from the chest wound, which was inflicted as the deceased lay upon the floor, indicated that she had been in a state of shock when she sustained it.  Appellant fired all three shots from the nine millimeter pistol within a short span of time.
(footnote: 3)
 A fourth shot, from the revolver found in the hallway, struck the upper part of the wall at the end of the hallway.  Investigators found bullets for the revolver in the master bedroom’s closet.  To reach the closet from the living room, one would have to walk past the bathroom door.  Although the revolver emits a cloud of gunpowder when fired, neither the deceased nor appellant had any measurable amounts of gunpowder on their hands.  The revolver did not have any identifiable fingerprints on it.  The deceased’s manicured fingernails were in perfect condition and did not contain any traces of appellant’s skin or blood.

After hearing the evidence, the jury failed to find that appellant acted under the influence of sudden passion and assessed punishment of life in prison.

In his sole point, appellant contends that the evidence is factually insufficient to negate the defensive issue of sudden passion.  He argues that when the entire record is considered and the State’s evidence is balanced against appellant’s mitigating evidence, the record is factually insufficient to negate the defensive theory.  
Appellant misstates the State’s burden of proof.

The State was not required to negate the existence of sudden passion.  Rather, appellant had the burden of proving it by a preponderance of the evidence. 
 Naasz v. State
, 974 S.W.2d 418, 420 (Tex. App.—Dallas 1998, pet. ref’d).
 
 
Accordingly, we review appellant's point as complaining that the jury's failure to find that he was under the influence of sudden passion when he murdered the deceased was against the great weight and preponderance of the evidence.  
See id.; Hernandez v. State,
 127 S.W.3d 206, 212 (Tex. App.—Houston [1st Dist.] 2003, no pet.); 
Bumguardner v. State
, 963 S.W.2d 171, 176 (Tex. App.—Waco 1998, pet. ref'd); 
Meraz v. State
, 785 S.W.2d 146, 155 (Tex. Crim. App. 1990).

In reviewing this point, we must consider all of the evidence relevant to the issue of sudden passion and determine whether the verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust.  
Meraz
, 785 S.W.2d at 155.  
We are to give deference to the fact finder’s determinations, including determinations involving the credibility and demeanor of witnesses.  
Zuniga v. State, 
144 S.W.3d 477, 481 (Tex. Crim. App. 2004); 
Cain v. State
, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  We may not substitute our judgment for that of the fact finder’s. 
 Zuniga, 
144 S.W.3d at 482.

At the punishment stage of a murder trial, the defendant may raise the issue of whether he caused the death under the immediate influence of sudden passion arising from an adequate cause.  
Tex. Pen. Code Ann. 
§ 19.02(d) (Vernon 2003).  "Sudden passion" means passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed that passion arises at the time of the offense and is not solely the result of former provocation.  
Id.
 § 19.02(a)(2).  
"Adequate cause" means cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection.  
Id.
 § 19.02(a)(1).  The accused may not rely upon a cause of his own making, such as precipitating a confrontation.
 
 Naasz
,
 
974 S.W.2d at 423.  
If the defendant proves sudden passion 
by a preponderance of the evidence, the offense is punished as a second-degree felony. 
 
Tex. Pen. Code Ann. 
§ 19.02(d)
.

Appellant’s sudden passion argument was based on his testimony that  he shot the deceased in a state of terror caused by the deceased’s shooting the revolver at him.
(footnote: 4)  The jury was free to make its own determination of appellant’s credibility and reject appellant’s version of events if it did not believe he was telling the truth.  
See
 
Zuniga, 
144 S.W.3d at 481; 
Cain, 
958 S.W.2d at 407.  
The jury could have doubted appellant’s story based on his strange response to the deceased’s allegedly firing the pistol at him twice or the lack of physical evidence to support his contentions that she fired the revolver and struggled with him.

In addition to his testimony, appellant cites the presence of the revolver in the hallway and a bullet from that revolver in the hallway wall, his brother’s testimony that the deceased previously pointed a gun at appellant when she was angry with him, and his demeanor as observed by the first police officer to arrive at the scene.  
None of this evidence, however, compelled the jury to find that appellant murdered the deceased under the influence of sudden passion.

The fact that the revolver had been fired did not prove that it had been fired by the deceased.  Moreover, even if the jury believed appellant’s brother’s testimony about the deceased’s pointing a gun at appellant in the past, it was not bound to conclude that she did so on the day of her murder.  
Without the deceased’s fingerprints on the revolver or gun powder on her hands, the jury could have concluded that appellant fired the revolver after he murdered the deceased to make it look like self-defense.

Further, the fact that appellant appeared distraught to the police officer who first arrived on the scene did not require the jury to believe that he was in a state of terror when he committed the murder.  The testimony merely showed that appellant acted like he wanted the officer to help the deceased after she was already dead.  The jury could have weighed that testimony against the testimony that appellant seemed calm just minutes after he appeared distraught and the fact the appellant called his sister, rather than 911, after the shooting and concluded that his demeanor was contrived.

After weighing all of the evidence, we conclude that the jury’s failure to find that appellant murdered his wife under the immediate influence of sudden passion was not so contrary to the great weight and preponderance of the evidence 
as to be clearly wrong and unjust.
  
Accordingly, we overrule appellant’s sole point and affirm the judgment of the trial court.

JOHN CAYCE

CHIEF JUSTICE

PANEL A: CAYCE, C.J.; DAUPHINOT and WALKER, JJ.

PUBLISH

DELIVERED: February 3, 2005

FOOTNOTES
1:
Appellant testified that the deceased had also been unfaithful to him.

2:
Appellant denied that he was opposed to the deceased finding a better job.  To the contrary, he had encouraged her find a higher paying job because they were having financial difficulties.  He said that his brother had been trying to get her a job at the Nissan plant in Irving.

3:
The nine millimeter pistol was found on the living room floor.  Its clip had been emptied, with the bullets left next to the gun.  Appellant did not remember emptying it.

4:
We note that even if the deceased did fire the pistol, that act would not constitute adequate cause because it was precipitated by appellant’s conduct.  According to appellant, the deceased fired the pistol at him because he brought a woman’s phone number home in his wallet.  Because a defendant arguing sudden passion may not rely upon cause of his own making, 
Naasz, 
974 S.W.2d at 423, 
the deceased’s alleged firing of the pistol does not support legally adequate cause.  The State did not raise this issue at trial, however.