COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-06-184-CR

JOHN RAY SAIN APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM CRIMINAL DISTRICT COURT NO. 1 OF TARRANT COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

Appellant John Ray Sain appeals his conviction and sentence for murder.  In seven points, appellant challenges the legal and factual sufficiency of the evidence to support the jury’s rejection of self-defense and defense of property, the legal and factual sufficiency of the evidence to support the jury’s failure to find sudden passion, and the admission of the deceased’s statements through three witnesses over appellant’s Confrontation Clause objections.  We affirm.

On November 15, 2003, around ten o’clock in the morning, appellant shot and killed his wife, Elena Sain, after she broke into their house through a bedroom window.  Elena was leaving appellant because he abused her, and she did not think he was home when she entered the house to retrieve her belongings.  Appellant claimed that he shot Elena because he thought that she was a burglar. 

Following a five-day trial, a jury convicted appellant of intentional or knowing murder, rejecting his claims of self-defense and defense of property.  After hearing evidence and argument on punishment, the jury refused to find that appellant acted as a result of sudden passion and assessed punishment at fifty years’ confinement. 

In his first and second points, appellant complains that the evidence is legally and factually insufficient to support his conviction for intentional or knowing murder but rather showed that he acted in self-defense or defense of property.  

The use of deadly force in self-defense can serve as a defense to otherwise criminal behavior.
(footnote: 2)  In that regard, the law in effect at the time of the murder in this case
(footnote: 3) provided,

(a) A person is justified in using deadly force against another:

(1) if he would be justified in using force against the other under Section 9.31;
(footnote: 4)
 

(2) if a reasonable person in the actor’s situation would not have retreated; and

(3) when and to the degree he reasonably believes the deadly force is immediately necessary:

(A) to protect himself against the other’s use or attempted use of unlawful deadly force; or

(B) to prevent the other’s imminent commission of aggravated kidnaping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery.

(b) The requirement imposed by Subsection (a)(2) does not apply to an actor who uses force against a person who is at the time of the use of the force committing an offense of unlawful entry in the habitation of the actor.
(footnote: 5)

In addition, it is a defense to prosecution if the conduct in question is based on the defense of one’s property.
(footnote: 6)  Texas law provides,

A person is justified in using deadly force against another to protect land or tangible, movable property:

(1) if he would be justified in using force against the other under section 9.41;
(footnote: 7) and

(2) when and to the degree he reasonably believes the deadly force is immediately necessary:

(A) to prevent the other’s imminent commission of arson, burglary, robbery, aggravated robbery, theft during the nighttime, or criminal mischief during the nighttime; or

(B) to prevent the other who is fleeing immediately after committing burglary, robbery, aggravated robbery, or theft during the nighttime from escaping with the property; and

(3) he reasonably believes that:

(A) the land or property cannot be protected or recovered by any other means; or

(B) the use of force other than deadly force to protect or recover the land or property would expose the actor or another to substantial risk of death or serious bodily injury.
(footnote: 8)
 After the defendant has introduced some evidence of a defense such as self-defense or defense of property (as opposed to an affirmative defense), the State bears the burden of persuasion to disprove the defense.
(footnote: 9)  This burden does not require the State to introduce evidence disproving the defense; rather, the State must prove its case beyond a reasonable doubt.
(footnote: 10)  When a jury finds the defendant guilty, there is an implicit finding against the defensive theory.
(footnote: 11)
 When reviewing the legal sufficiency of the evidence in the context of the jury’s rejection of a defense, we ask whether, after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt and also could have found against appellant on the defensive issue beyond a reasonable doubt.
(footnote: 12)   When a defendant challenges the factual sufficiency of the rejection of a defense, we review all of the evidence in a neutral light and ask whether the State’s evidence taken alone is too weak to support the finding and whether the proof of guilt, although adequate if taken alone, is against the great weight and preponderance of the evidence.
(footnote: 13)
 The legal and factual sufficiency standards of review are the same for cases based on direct and circumstantial evidence.
(footnote: 14)  In a sufficiency review, however, the jury’s inference of intent is afforded more deference than the evidence supporting proof of conduct, and circumstantial evidence of a defendant’s guilty knowledge is not “required to meet the same rigorous criteria for sufficiency as circumstantial proof of other offensive elements.”
(footnote: 15) 

The evidence at trial showed as follows:  

Appellant had physically abused Elena in the week before her death.  Elena told several witnesses that appellant had abused her, and she indicated to one that she was afraid appellant would kill her.  Four witnesses saw bruises or abrasions on Elena’s body in the days before her death, and the medical examiner found bruises on Elena’s arm that were several days old.  Further, Elena claimed that appellant had abused her two dogs, which were trained and licensed to detect her seizures. 

In the days leading up to her death, Elena was in the process of leaving appellant.  Officer Mike Lilly responded to a domestic disturbance at the Sains’ house on November 12 when appellant locked Elena out of the house.  Officer Lilly advised Elena to find another place to stay and to speak to an attorney.  On November 14, one day before her murder, Elena left the house with her dogs, and a friend, Karen LaBarre, helped her cash her paycheck and check into a motel.  Also on November 14, Valerie Shepard, a manager of an apartment complex, showed Elena an apartment.  Elena told Shepard she needed something right away and was most concerned with safety features such as the apartment’s alarm system, access gate, and courtesy officer because she was leaving an abusive situation.  Elena arranged to pick up the keys to the apartment on November 15.  Elena returned to her house on November 15 only to pick up some of her belongings while her husband, she thought, was away.   On the morning of the murder, appellant appeared to be away from home.  Elena knew that appellant had registered and paid for an all-day gun show that day.  She had also searched for, but had not found, appellant’s car in the driveway and surrounding neighborhood.
(footnote: 16)  Finally, Elena had circled the house on foot for approximately fifteen to twenty minutes, knocking on windows, looking through the blinds, trying to open the garage door with the electronic keypad, and unsuccessfully trying her key at the front door.  Elena told her neighbor, LaBarre, and Officer Lilly that she knew appellant was not home.  Further, the jury heard a 911 call that Elena made before entering the house, in which she told the operator that her husband was not home and she was going to break a window to enter the house because her husband had changed the locks and put something on the garage door that prevented it from opening.
(footnote: 17)  Elena, therefore, removed a screen from a window, used a metal boot brush and shovel to break the window, pushed aside the curtains, and began to enter the house. 

Appellant testified in his own defense.  He claimed that on the morning of November 15 the sound of the bedroom window breaking woke him from his sleep, and he saw a figure advancing from behind the blinds and curtains that hung from the window.  There was evidence that with the blinds and curtains in place and lights off, the bedroom was dark, even during the day.  Appellant testified that he thought the intruder would have a gun, although he did not see one, and that he had no way to exit the bedroom.  Therefore, he fired two shots at the intruder in self-defense.  Neighbors Beth and Jason Glavin, however, both testified that there was an approximately twenty- or thirty-second delay between the time Elena entered the house through the window and the moment that they heard the first shot.  Further, the 911 operator called appellant’s home phone but received no response, and appellant returned the call on his cell phone at 9:35 a.m., suggesting that he was in fact awake before the break-in.
(footnote: 18) 

Appellant also knew that Elena had threatened to break a window to enter their home in the past.  During his testimony, appellant acknowledged that he had locked Elena out of the house on November 12 and that she had threatened to break a window or door to reenter.  Appellant also admitted that although Elena left unexpectedly with her dogs on November 14, he expected her to come home on the day she was killed. 

Appellant claimed that he did not pretend to be away from home.  He explained that on the morning of the murder, he dropped his car off at his parents’ house and picked up his son’s car because he planned to do work on it.  Upon returning to his house, he parked his son’s car approximately two houses away from his house—rather than in the driveway, his usual spot, even though he had some trouble walking—because he planned to spray weedkiller and did not want it to get on the car.
(footnote: 19)  The car was left within sight of the house, and appellant maintained that Elena was familiar with the vehicle.  Further, appellant claimed he last changed the locks to the house after the couple’s argument on November 12 but had given Elena a copy of the new keys when they reconciled later that night, and the defense investigator testified that keys found on Elena’s body after her death did open some of the doors of the house.  Appellant claimed that he did not put anything on the garage door to prevent it from opening. 

During his testimony, appellant also denied abusing Elena or the dogs.  Appellant claimed that Elena received bruises from breaking up a fight between the dogs.  Officer Lilly admitted that, although Elena expressed fear for the dogs’ safety with appellant on November 12, she later conceded that appellant had not hurt the dogs in the past.  Officer Lilly did not see injuries on Elena or the dogs on November 12. 

The ballistics evidence was consistent with both the State’s and appellant’s theories.  Officer Brad Patterson, who processed the crime scene, concluded that appellant shot from the foot of the bed.  The State’s ballistics expert, however, indicated on cross-examination that gunshot residue, holes and tears in the bed linens, and a nick on the bedpost were consistent with appellant’s claim that he fired the shots from a kneeling position at the head of the bed.  The defense investigator, a former police officer, indicated that shooting from such a position could be consistent with either a “defensive posture” or an ambush. 

The jury also heard evidence that appellant was not upset by his wife’s death.  After the shooting, neighbor Jason Glavin ran over to appellant’s house.  Jason testified that appellant did not have “much reaction,” was not emotional, and did not attempt to aid Elena.  Jason also saw appellant laughing while seated in the backseat of a police car.  Officer Lilly testified that appellant did not appear to be in shock but rather seemed “matter of fact about the circumstance.”  The officer also stated, however, that appellant was excited, talking very fast, and red in the face.  Appellant admitted that he did not try to help Elena, but he did call 911 and thought that he might have been in shock at the time.  The State also showed the jury a personal ad that appellant placed on the website “bride.ru” in January 2004, less than two months after Elena’s death.  Appellant testified that he was sorry that he had killed his wife and that the personal ad was suggested by a counseling group he attended. 

While there is some evidence in the record supporting appellant’s claims of self-defense and defense of his property, there is also evidence from which a rational jury could have dismissed appellant’s defensive claims.  The jury was free to accept or reject all or part of the defensive evidence.
(footnote: 20)  After carefully considering the evidence and applying the appropriate standards of review,
(footnote: 21) we conclude that the evidence is legally and factually sufficient to prove the essential elements of murder beyond a reasonable doubt and to support the jury’s rejection of appellant’s defensive theories.  We, therefore, overrule appellant’s first and second points.

In his third and fourth points, appellant contends that the evidence is legally and factually insufficient to support the jury’s negative finding on sudden passion. 

During the punishment phase of a murder trial, a defendant may raise the issue of whether he caused a person’s death under the immediate influence of sudden passion arising from an adequate cause.
(footnote: 22)  “Sudden passion” means passion directly caused by and arising out of a provocation by the individual killed or another acting with the person killed that arises at the time of the offense and is not solely the result of former provocation.
(footnote: 23)  “Adequate cause” means cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection.
(footnote: 24)  If the defendant proves sudden passion by a preponderance of the evidence, the offense is punished as a second-degree felony.
(footnote: 25)  The mere fact that an individual acts in response to provocation, however, is not even sufficient to warrant a sudden passion charge.
(footnote: 26)
 In reviewing a legal sufficiency challenge to the jury’s failure to find sudden passion, we examine the record for evidence that supports the negative finding while ignoring all evidence to the contrary.
(footnote: 27)  Only if no evidence supports the negative finding must we examine the entire record to determine whether it establishes the contrary position as a matter of law.
(footnote: 28)  In reviewing a factual sufficiency challenge to the jury’s failure to find sudden passion, we consider all the relevant evidence to determine whether the negative finding is so against the great weight and preponderance of the evidence as to be clearly wrong or manifestly unjust.
(footnote: 29)  Our evaluation should not substantially intrude upon the fact-finder’s role as the sole judge of the weight and credibility of witness testimony, and we may not substitute our judgment for that of the fact-finder.
(footnote: 30)
 Here, the evidence supporting appellant’s claim that the killing was a result of sudden passion arising from an adequate cause showed that he and Elena had a significant argument on November 12; she had unexpectedly left appellant on November 14; and she had just broken a window to enter their house.  Other evidence, however, such as the history of physical abuse by appellant, his unusual behavior of parking his son’s car away from the house on November 15, and his appearance after the shooting indicated that his actions were not caused by sudden passion.  Further, appellant knew Elena had threatened to break a window in order to enter the home only three days before her murder, and evidence showed that appellant had made a phone call shortly before her murder, indicating that he was not asleep as he claimed. 

Moreover, during punishment, Kathleen Sussi, appellant’s ex-wife, and Rebecca Lane, an ex-girlfriend, both testified that appellant harassed and threatened them when their relationships with him came to an end.
(footnote: 31)  Appellant pleaded guilty in 1988 to reckless conduct for pointing a gun at Sussi.  Appellant also pleaded guilty to criminal mischief in 1990 for damaging Lane’s car.
(footnote: 32)  Appellant presented the testimony of several witnesses that he was a truthful and peaceful person; however, most of these witnesses were not aware of appellant’s criminal history. 

The jury could have reasonably concluded that, even if Elena’s actions of leaving appellant or breaking the window gave rise to some provocation, appellant acted “coolly and deliberately.”
(footnote: 33)  Viewing the evidence under the appropriate standards,
(footnote: 34) we conclude that some evidence supports the negative finding on sudden passion, and we cannot say that the negative finding is so against the great weight and preponderance of the evidence as to be clearly wrong or manifestly unjust.  We overrule appellant’s third and fourth points.

In his fifth, sixth, and seventh points, appellant complains that the trial court improperly allowed witnesses Karen LaBarre, Valerie Shepard, and Vernette Langon to relate hearsay statements in violation of his constitutional rights to confrontation and cross-examination. 

The trial court held a hearing outside the presence of the jury on the admissibility of the hearsay statements.  The State proffered LaBarre’s testimony on statements that Elena made on November 12, 14, and 15.  The trial court sustained appellant’s objections to the November 12 and 14 statements, and LaBarre did not testify to those statements.  The trial court then summarized the November 15 statements as concerning Elena’s return to the house to get her things and the reasons why Elena thought appellant was not home.  Appellant did not object to that testimony either during the hearing or in front of the jury.
(footnote: 35)  Appellant, therefore, has forfeited his right to complain of Elena’s statements to LaBarre.
(footnote: 36)
 The State also proffered Elena’s statements to Valerie Shepard.  The trial court summarized Shepard’s testimony as addressing three issues: security measures in the apartment, abuse of Elena and the dogs, and Elena’s fear that appellant would kill her.  Appellant did not object to testimony regarding security measures, but he did object to the rest of Shepard’s proffered testimony.
(footnote: 37)  The trial court overruled appellant’s objections, and appellant obtained a running objection. 

In 
Crawford v. Washington
, the Supreme Court held that the admission of a hearsay statement made by a nontestifying declarant violates the Sixth Amendment if the statement was testimonial and the defendant lacked a prior opportunity for cross-examination, even if the statement falls under a hearsay exception.
(footnote: 38)  The Supreme Court declined to spell out a comprehensive definition of testimonial, but it stated that the term “applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations.”
(footnote: 39)  In 
Wall v. State
, the Texas Court of Criminal Appeals concluded that the testimonial character of a statement is determined by a reasonable, similarly situated declarant’s ability to appreciate the legal ramifications of his statement.
(footnote: 40)  We review the question of whether a statement is testimonial or nontestimonial de novo.
(footnote: 41)  

Shepard, an assistant property manager at an apartment complex, met Elena and showed her an apartment on the day before her death.  Shepard’s testimony indicates that Elena’s statements were volunteered.  Spontaneous statements to acquaintances are not testimonial.
(footnote: 42)  We, therefore, conclude that Elena’s statements to Shepard were not testimonial and that admission of these hearsay statements did not violate the Confrontation Clause.
(footnote: 43)
 In addition, the State proffered the testimony of Vernette Langon, a DPS trooper and neighbor of the Sains.  On the morning of her death, Elena approached Langon and asked if Langon would park her patrol vehicle in front of Elena’s house so that Elena could get some of her clothes out of the house.  Langon, who was off-duty at the time, said that she could not use the patrol car for that purpose but would accompany Elena to her house on foot.  After learning that appellant was taking a concealed handgun class, however, Langon decided that it would be best to contact the Fort Worth police department, and she assisted Elena in doing so.  Appellant’s Confrontation Clause objections were made only to the following:  Elena told Langon that she had been abused, was scared, knew her husband was not home, and went to her house to retrieve some of her belongings.  The trial court overruled appellant’s objection and granted him a running objection to Langon’s testimony. 

The statements to Langon differ from the other statements in that they were made to a law enforcement officer.  Not all statements to law enforcement personnel, however, are testimonial under 
Crawford
.
(footnote: 44)  In a later case, 
Davis v. Washington
, the Supreme Court articulated the following rule:

Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.  They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.
(footnote: 45)

Further, we have held that the timing, purpose, and setting of the statement may be relevant.
(footnote: 46)  We may also look to the degree of formality of a declarant’s interaction with the police, the purpose and structure of police questioning, and the likelihood that the declarant expected that the statements could be used in a criminal prosecution.
(footnote: 47) 

Here, Langon was not interviewing or interrogating Elena.  Rather, Elena informally approached Langon to request immediate assistance because she believed that she was in danger.  Langon stated that Elena was desperate to get back into the house while appellant was not home.  Generally, statements that are made to police while the declarant believes that she is in personal danger are not made with consideration of their legal ramifications because the declarant speaks out of urgency and a desire to obtain a prompt response.
(footnote: 48) 

For these reasons, we conclude that Elena’s statements to Langon were not testimonial.
(footnote: 49)  Therefore, their admission did not violate appellant’s rights under the Confrontation Clause.
(footnote: 50)  We overrule appellant’s fifth, sixth, and seventh points.

Having overruled all of appellant’s points, we affirm the trial court’s judgment.

PER CURIAM

PANEL F:  CAYCE, C.J.; HOLMAN and GARDNER, JJ.

DO NOT PUBLISH 

Tex. R. App. P.
 47.2(b)

DELIVERED:  December 20, 2007 
 

FOOTNOTES
1:
See
 Tex. R. App. P.
 47.4.

2:
Tex. Penal Code Ann.
 §§ 9.02, 9.31, 9.32 (Vernon 2003).

3:
Although sections 9.31 and 9.32 have since been amended, the offense for which appellant was convicted occurred before the effective date of the amendments (September 1, 2007) and, therefore, is governed by the previous version of these statutes.  
See
 Act of March 21, 2007, 80th Leg., R.S., S.B. 378, §§ 5, 6 (codified as an amendment of 
Tex. Penal Code Ann.
 §§ 9.01, 9.31, 9.32 and 
Tex. Civ. Prac. & Rem. Code Ann.
 § 83.001). 

4:
A person is justified in using force against another when and to the degree he reasonably believes the force is immediately necessary to protect himself against the other’s use or attempted use of unlawful force.  
Tex. Penal Code Ann
.
 
§ 9.31(a).

5:
Id.
 § 9.32.  

6:
Id. 
§§ 9.02, 9.41, 9.42 (Vernon 2003).

7:
A person in lawful possession of land or tangible, movable property is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to prevent or terminate the other’s trespass on the land or unlawful interference with the property.  
Id.
 § 9.41(a).

8:
Id.
 § 9.42.

9:
Zuliani v. State
, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003); 
Saxton v. State
, 804 S.W.2d 910, 913–14 (Tex. Crim. App. 1991); 
Dotson v. State
, 146 S.W.3d 285, 291 (Tex. App.—Fort Worth 2004, pet. ref’d).

10:
Zuliani
, 97 S.W.3d at 594; 
Saxton
, 804 S.W.2d at 913; 
Dotson
, 146 S.W.3d at 291.

11:
Zuliani
, 97 S.W.3d at 594; 
Saxton
, 804 S.W.2d at 914.

12:
Saxton
, 804 S.W.2d at 914; 
Dotson
, 146 S.W.3d at 291.

13:
Zuliani
, 97 S.W.3d at 595.

14:
King v. State
, 29 S.W.3d 556, 565 (Tex. Crim. App. 2000).

15:
Margraves v. State
, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000). 

16:
There was evidence that the garage was full, and, therefore, the car could not be inside it.  

17:
Elena called 911 in order to alert the police that, in case an alarm went off, she was not a burglar. 

18:
Elena’s 911 call, reporting that she was about to enter the house, ended at 9:51 a.m., and Beth Glavin’s 911 call reporting that shots were fired occurred at 9:56 a.m.

19:
Appellant also testified, however, that he went to Wal-Mart and Home Depot around 6:00 a.m. on the morning of November 15 in part because he was out of weedkiller, but Wal-Mart did not have the weedkiller, and Home Depot was not open. 

20:
Saxton
, 804 S.W.2d at 914; 
Bishop v. State
, No. 02-03-00443-CR, 2005 WL 1189317, at *7 (Tex. App.—Fort Worth May 19, 2005, pet. ref’d) (mem. op., not designated for publication).

21:
Zuliani
, 97 S.W.3d at 595; 
Saxton
, 804 S.W.2d at 914.

22:
Tex. Penal Code Ann. 
§ 19.02(d) (Vernon 2003 & Supp. 2006); 
Trevino v. State
, 157 S.W.3d 818, 821 (Tex. App.—Fort Worth 2005, no pet.).

23:
Tex. Penal Code Ann. 
§ 19.02(a)(2); 
Trevino
, 157 S.W.3d at 821–22.

24:
Tex. Penal Code Ann. 
§ 19.02(a)(1); 
Trevino
, 157 S.W.3d at 822. 

25:
Tex. Penal Code Ann. 
§ 19.02(d); 
Trevino
, 157 S.W.3d at 822.

26:
Trevino v. State
, 100 S.W.3d 232, 241 (Tex. Crim. App. 2003).

27:
Howard v. State
, 145 S.W.3d 327, 334 (Tex. App.—Fort Worth 2004, no pet.);
 Cleveland v. State
, 177 S.W.3d 374, 387 (Tex. App.—Houston [1st Dist.] 2005, pet. ref’d), 
cert. denied
, 547 U.S. 1073 (2006); 
Cover v. State
, 913 S.W.2d 611, 619 (Tex. App.—Tyler 1995, pet. ref’d).

28:
Howard
, 145 S.W.3d at 334; 
Cleveland
, 177 S.W.3d at 387; 
Cover
, 913 S.W.2d at 619.

29:
See
 
Trevino
, 157 S.W.3d at 821;
 Naasz v. State
, 974 S.W.2d 418, 421 (Tex. App.—Dallas 1998, pet. ref’d).

30:
Trevino
, 157 S.W.3d at 821.

31:
For example, Lane testified that appellant ripped her birth certificate in half, threatened to pour gasoline on her or her property, broke her freezer door and car antenna, attempted to break into the trunk of her car and enter her house, jumped on the hood of her car, piled dirt outside her front door, scratched “gold digger” into the side of her car, punctured thirteen tires, dumped weed killer on her lawn with the words “bitch” and “you die,” broke into her mailbox, scratched “you die” on her mailbox, tried to run her off the road, followed her and her children, broke into a law office where she worked and stole some items, turned off her electricity from the outside on more than one occasion, and broke into her house and stole some items. 

32:
Appellant also pleaded guilty to an obscenity charge in 1992 and was assessed one year probation. 

33:
Johnson v. State
, 815 S.W.2d 707, 711 (Tex. Crim. App. 1991).

34:
See Trevino
, 157 S.W.3d at 820; 
Howard
, 145 S.W.3d at 334.

35:
Appellant did object based on hearsay to the first phone call that Elena made to LaBarre around 8:30 a.m. on November 15 and to a question of whether Elena followed through on a promise she made to LaBarre not to enter the house without the police.  Both of these objections were sustained, and LaBarre did not answer those two questions.  

36:
Tex. R. App. P.
 33.1; 
see Mendez v. State
, 138 S.W.3d 334, 341–42 (Tex. Crim. App. 2004).
 

37:
In the trial court, appellant objected to these three witnesses’ testimony based on “hearsay, relevance, doesn’t go to state of mind, violation of confrontation cross-examination and a 403 objection.”  On appeal, however, he contends only that his “constitutional rights to confrontation and cross-examination” were violated by the hearsay statements.  Appellant also mentions in passing that “there is not even a recognized exception to the hearsay rules” and that the testimony establishing prior abuse was “extraneous and prejudicial.”  Because he does not cite relevant case law to support his arguments, if any, based on hearsay and Rule 403, we do not address these grounds.  
See
 
Tex. R. App. P.
 38.1(h). 

38:
541 U.S. 36, 68, 124 S. Ct. 1354, 1374 (2004).

39:
Id. 
at 
68, 124 S. Ct. at 1374.

40:
184 S.W.3d 730, 742 (Tex. Crim. App. 2006).

41:
Id
.

42:
Woods v. State
, 152 S.W.3d 105, 114 (Tex. Crim. App. 2004), 
cert. denied
, 544 U.S. 1050 (2005); 
Freeman v. State
, 230 S.W.3d 392, 401 (Tex. App.—Eastland 2007, pet. ref’d) (citing 
Crawford
, 541 U.S. at 51, 124 S. Ct. at 1354 (noting that “[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not”)); 
see also
 
Wall
, 184 S.W.3d at 735 & n.11.

43:
See Woods
, 152 S.W.3d at 114. 

44:
See
, 
e.g.
, 
Davis v. Washington
, 126 S. Ct. 2266, 2273–74 (2006).

45:
Id.

46:
Martinez v. State
, 236 S.W.3d 361, 372 (Tex. App.—Fort Worth 2007, pet. dism’d).

47:
See id
.

48:
Wall
, 184 S.W.3d at 742.

49:
See id.

50:
See Woods
, 152 S.W.3d at 114.