

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00207-CR

_____

ANTON THORP, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 158th District Court
Denton County, Texas
Trial Court No. F19-3517-158

Before Sudderth, C.J.; Womack and Wallach, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

Appellant Anton Thorp fired his 9-millimeter pistol at his live-in girlfriend, Jane,[1] eighteen times. Seventeen of the eighteen bullets struck Jane, and Jane died from her wounds.

A jury found Thorp guilty of murder, and the trial court sentenced Thorp to life imprisonment.

In one issue on appeal, Thorp argues that since he had proven his sudden-passion defense[2] by a preponderance of the evidence, the trial court erred by sentencing him to life in prison because 20 years' confinement was the maximum prison sentence that he could have received.[3] *See* Tex. Penal Code Ann. §§ 12.33(a), 19.02(a), (c), (d). Because both legally and factually sufficient evidence supports the trial court's rejection of Thorp's sudden-passion defense, we overrule Thorp's issue and affirm the trial court's judgment.

---

[1]To protect the identities of the victim, Thorp's child, and the mother of Thorp's child, we use pseudonyms. *See* Tex. R. App. P. 9.8 cmt.; *McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).

[2]"[S]udden passion is a defensive issue." *Jones v. State*, 613 S.W.3d 274, 275 (Tex. App.—Austin 2020, pet. ref'd).

[3]A murder committed under the influence of sudden passion does not absolve a defendant of the offense but does impact the defendant's punishment range. Tex. Penal Code Ann. § 19.02(d).

## I. Murder and Sudden Passion

The Texas Penal Code addresses both (1) murders and (2) murders committed under the influence of sudden passion. *Id.* § 19.02. It provides that a person commits first-degree murder if he "intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual." *Id.* § 19.02(b)(2). But if the accused caused the death "under the immediate influence of sudden passion[4] arising from an adequate cause,"[5] the offense is second-degree murder. *Id.* § 19.02(d). To reduce the punishment range from first-degree to second-degree murder, a defendant must prove sudden passion "in the affirmative by a preponderance of the evidence." *Id.* § 19.02(d).

Because the defendant has the burden of proof by a preponderance of the evidence, sudden passion is akin to an affirmative defense. *See Matlock v. State*, 392 S.W.3d 662, 667 n.14, 671 (Tex. Crim. App. 2013); *Bradshaw v. State*, 244 S.W.3d 490, 502 (Tex. App.—Texarkana 2007, pet. ref'd). And, as a defense with a preponderance-of-the-evidence burden of proof, sudden passion may be evaluated for

---

[4]"'Sudden passion' means passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation." *Id.* § 19.02(a)(2).

[5]"'Adequate cause' means cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." *Id.* § 19.02(a)(1).

both legal and factual sufficiency. *See Butcher v. State*, 454 S.W.3d 13, 20 (Tex. Crim. App. 2015); *Matlock*, 392 S.W.3d at 667, 669–72.

## II. Sudden Passion and Legal Sufficiency

When a factfinder rejects a sudden-passion finding, we review the evidentiary sufficiency by searching the record for a scintilla of evidence favorable to the factfinder's refusal to make that finding and by disregarding all evidence to the contrary unless a reasonable factfinder could not. *Butcher*, 454 S.W.3d at 20 (citing *Matlock*, 392 S.W.3d at 669–70). The failure to make the finding should not be overturned on legal sufficiency grounds unless the appealing party establishes that the evidence conclusively proves his sudden-passion defense, and no reasonable factfinder was free to think differently. *Id.*

## III. Sudden Passion and Factual Sufficiency

When reviewing the absence of a sudden-passion finding for factual sufficiency, we examine the evidence in a neutral light. *Id.* And when a factfinder rejects the defendant's defense, we cannot overrule the factfinder unless, after setting out the relevant evidence supporting the verdict, we clearly state why the verdict is so much against the great weight of the evidence as to be manifestly unjust, shocks the conscience, or clearly demonstrates bias. *Id.*

A factfinder is free to make its own credibility determinations and to reject evidence. *Trevino v. State*, 157 S.W.3d 818, 822 (Tex. App.—Fort Worth 2005, no pet).

4

Affording due deference to the factfinder's determination, we must reach a high level of skepticism before reversing a factfinder on this basis. *Bradshaw*, 244 S.W.3d at 502.

## IV.  Discussion

## A.  The Evidence

According to Thorp's statement to detectives after the murder, prior to the shooting, Thorp and Jane had been in a fight.  During that fight, Jane threatened to take custody of his son Tim.[6]  One of the detectives who interviewed Thorp after the murder paraphrased Thorp's explanation for the murder:  "If I'm going to go to jail and lose [my son], I'm going to make it worth it."

Evidence regarding Thorp's character and propensity for violence varied widely at trial.  In his defense, Thorp was praised as an excellent father, a very good father, a highly devoted father, a proud father, and a good father who was primarily responsible for raising Tim.  In short, as a father, witnesses consistently praised Thorp.

Five witnesses—Thorp's father, three friends from Thorp's youth, and a former manager—also spoke well of him in general.

Additionally, Denise Davis, a woman who had shared a sexual relationship with Thorp spanning at least twelve years, also spoke well of Thorp.  Specifically, she testified that she had never seen him display any violent tendencies.  And, in fact,

---

[6]Jane was not Tim's mother.  Tim's mother, Sarah, testified at trial.

5

according to Davis, the only violence that had ever occurred in their relationship was perpetrated by her when she punched Thorp in the mouth and injured herself in the process.

On the other hand, the factfinder also heard testimony about Thorp's volatile relationship with Tim's mother, Sarah, and his propensity for violence against her and others with little or no provocation.

Sarah testified that when she was in a relationship with Thorp, his demeanor could change very quickly. According to Sarah, Thorp was controlling and often angry, and on several occasions when his anger had flared, he had physically assaulted her.

For example, she described one assault that occurred when Thorp thought that she had been rocking Tim for too long. According to Sarah, after she put Tim back in his crib, Thorp dragged her across the apartment by her hair to their bedroom, made her stand up in front of him, and then beat her. In describing the incident, Sarah commented, "[T]here was a point where I didn't see anything but literally stars," and "[T]here was hair all over the apartment." She continued, "I tried to crawl away[,] and he started stomping me as well. And then [he] started punching me more in my back."

On another occasion, after Sarah walked the dog, Thorp told her that she had taken too long and he slapped her, causing her glasses to fly across the apartment. Then he took her phone and hit her face with it.

Sarah testified that she had once tried to leave with Tim, but Thorp blocked the hallway so she could not get her son. Thorp then warned her, "The only way that you're leaving me is in a body bag." So, according to Sarah, when Thorp later ordered her to go to the store to purchase something for him, she left—without Tim—and never came back. When questioned about the potential risk to Tim by leaving him behind, she explained that Thorp had never acted aggressively toward Tim.

Sarah testified as to Thorp's violence against men as well. For example, Sarah said that on one occasion, a person named Chad had slammed the door too loudly after leaving their apartment. According to Sarah, Thorp ran out after him and knocked out Chad's front teeth.[7]

Sarah described another occasion involving someone named JP, whom she said Thorp often argued with. After returning from taking out the trash, Thorp told Sarah that he thought that he had gouged out JP's eyes. The next time that Sarah saw JP, he was wearing an eyepatch.[8]

Sarah also described occasions when she had the opportunity to interact with Jane. During custody exchanges of Tim and when Thorp was present, Sarah said that

---

[7]At trial, Chad also testified about the incident. Chad explained that when he left Thorp's apartment, he unintentionally slammed the door. According to Chad, Thorp followed him to his car, said "Hey," and punched him two or three times in the mouth. Chad concluded, "I -- I spit my teeth in my hand[,] and I threw them in my ashtray of my car and -- and drove away. I was just trying to get away."

[8]Sarah denied knowing that the police report identified Thorp as the victim. She was aware, however, that Thorp was the person who had called the police.

Jane would keep her head down, would not look at Sarah, and would not speak. But in private moments, when Thorp was not present, Sarah described Jane as talkative. At one point, Sarah told Thorp that she wanted Jane's phone number, but Thorp said that she was not allowed to have it.

Jane's sister also testified about Jane's demeanor when Thorp was nearby. She related that about a month before Thorp had murdered Jane, when she and Jane had talked on the phone, Jane had become very distant, and when Thorp came into the room, Jane immediately hung up.

But the jury also heard testimony from Dr. Charles Keenan, a forensic psychologist, who evaluated Thorp and testified on his behalf. According to Dr. Keenan, Thorp was atypical of most murder suspects because he was not psychotic. Rather, according to Dr. Keenan, Thorp had paranoia—a sensitivity to threats—with a hysterical component.

Dr. Keenan explained that if Thorp perceived a significant threat, "it overwhelm[ed] him, [such] that his capacity to restrain himself to not act out to that threat [wa]s essentially overwhelmed." The threat did not have to entail physical violence. Dr. Keenan described two general types of threats—a threat to safety or well-being and a threat of loss—and identified the latter as the one that triggered Thorp's paranoia:

> In my clinical professional experience, there are two broad categories of threats that will put almost any individual, regardless of who they are and where they are, in a crisis. And the one threat, as we see all the time, is a

threat to their personal safety and well-being or the threat -- direct threat to a family member or loved one's personal safety and well-being. Or -- or -- and sometimes it's almost parallel, the threat of loss. The threat of loss of a significant attachment. Boom. It puts them there over the line. And in my opinion, that's what happened here.

The fact that Thorp shot Jane seventeen times indicated to Dr. Keenan that Thorp was "overwhelmed and terrified" at the time of the shooting.

But on cross-examination, Dr. Keenan acknowledged that he was present for Sarah's testimony, and he admitted that her testimony surprised him. As he put it, "She described an individual that [had] treated her in a very brutal, sadistic manner." And Dr. Keenan conceded that because Sarah had spent sixteen years with Thorp— as opposed to the eight hours that Dr. Keenan had spent with him—she probably had a better idea of who Thorp was. According to Dr. Keenan, Sarah's testimony did not fit his data—the Thorp that Sarah had described was not the Thorp that he had met.

## B. Analysis

The question for the factfinder was "whether [Thorp] caused the death under the immediate influence of sudden passion arising from an adequate cause." Thus, to prevail on his theory of sudden passion, Thorp had to persuade the factfinder of two elements: (1) that he was acting under the influence of sudden passion and (2) that his sudden passion arose from an adequate cause. *See* Tex. Penal Code Ann. § 19.02(d).

As to Dr. Keenan's expert testimony regarding Thorp's inability to restrain himself when sufficiently threatened, Dr. Keenan agreed that Sarah—who admittedly had interacted with Thorp far more over a period of time greatly exceeding the eight

9

hours that Dr. Keenan had spent with him—had described characteristics of Thorp that were inconsistent with his conclusion. Based upon that acknowledgement, a rational factfinder could have reasonably concluded that Dr. Keenan's opinion was based upon insufficient or incomplete data and was thus not well-founded or persuasive.

Regarding Davis's testimony that during her twelve-year intimate relationship with Thorp he had never displayed any violent tendencies, a reasonable factfinder could have determined that she was not a credible witness. Her testimony could have been discredited altogether based on her claim that prior to the murder, she had not talked to Thorp in about two years, a claim that was proven false when the State introduced text messages between the two—sent just days before the murder—suggesting that their intimate relationship had resumed. In those text messages exchanged four days before Thorp murdered Jane, Thorp texted Davis, "Girl, you got some good pussy," and Davis responded, "Thank you. You got some good dick too." On cross-examination, Davis admitted that these communications had occurred and explained, "That's how we talked to each other." She also admitted that after the murder, while Thorp was out on bond and awaiting trial, she and Thorp talked almost every day, although she denied that they had been intimate at that time.

As to Thorp's account of Jane's threat to take custody of Tim, a rational factfinder could have disbelieved Thorp's story altogether. Jane was not Tim's

10

mother; she had no legal relationship with him.[9]  Unlike Sarah, who as Tim's mother might have been able to make a credible threat to take custody of Tim, to make good on Jane's alleged threat, Jane would have to overcome considerable hurdles.  First, she would have had to establish standing, *see* Tex. Fam. Code Ann. § 102.003(a)(9), and, second, she still would have had to persuade a court that neither Thorp nor Sarah was a fit parent.  *See In re C.J.C.*, 603 S.W.3d 804, 817 (Tex. 2020) (orig. proceeding).  And even if the factfinder had believed by a preponderance of the evidence that Jane had threatened to take custody of Tim, as Thorp alleged, a rational factfinder could still have reasonably concluded that such a hollow threat was not an adequate cause to justify sudden passion, i.e., that it was not sufficient to have produced "a degree of anger, rage, resentment, or terror" sufficient to render Thorp "incapable of cool reflection."[10]  *See* Tex. Penal Code Ann. §§ 12.33(a), 19.02(a)(1); *see also Kinnett v. State*, 623 S.W.3d 876, 912 (Tex. App.—Houston [1st Dist.] 2020, pet. ref'd) (stating that factfinder can disbelieve even uncontroverted testimony).

---

[9]Thorp and Jane were not married, although apparently Thorp had discussed his intent to marry Jane with Jane's mother.

[10]Although Dr. Keenan seemed to indicate that Thorp was more susceptible to being triggered by such a threat, "adequate cause" is measured not by a standard of a person who suffers from paranoia with a hysterical component, but by the standard of "a person of ordinary temper."  *See Harper v. State*, 508 S.W.3d 461, 470 (Tex. App.—Fort Worth 2015, pet. ref'd) (citing *Miller v. State*, 770 S.W.2d 865, 867 (Tex. App.—Austin 1989, pet. ref'd)).

11

Finally, there was ample evidence showing that with little or no provocation, Thorp could act with disproportionate and extreme violence.

More than a scintilla of favorable evidence supported the trial court's refusal to make the sudden-passion finding. Although some contrary evidence existed, a reasonable factfinder could have disregarded it. *See Butcher*, 454 S.W.3d at 20. The evidence did not conclusively prove Thorp's sudden-passion defense. *See id.* We thus overrule the portion of Thorp's issue challenging the legal sufficiency of the evidence. *See id.*

As for factual sufficiency, when deferring to the factfinder's credibility determinations and viewing the evidence in a neutral light, we hold that the factfinder's failure to find sudden passion was not so against the great weight of the evidence as to be manifestly unjust, to shock the conscience, or to show clear bias. *See id.* We therefore overrule the portion of Thorp's issue challenging the factual sufficiency of the evidence. *See id.*

Having overruled both parts of Thorp's sole issue on appeal, we affirm the trial court's judgment.

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: June 1, 2023

12