**Opinion issued April 6, 2023.**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-22-00288-CR**

———————————

**ANDREW MARTINEZ, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 22nd District Court**
**Hays County, Texas[1]**
**Trial Court Case No. CR-16-0994-A**

---

[1]   The Texas Supreme Court transferred this appeal to this Court from the Court of Appeals for the Third District of Texas, pursuant to its docket-equalization authority. *See* TEX. GOV'T CODE § 73.001 ("The supreme court may order cases transferred from one court of appeals to another at any time that, in the opinion of the supreme court, there is good cause for the transfer."). We are unaware of any conflict between the precedent of the Court of Appeals for the Third District and that of this Court on any relevant issue. *See* TEX. R. APP. P. 41.3.

**MEMORANDUM OPINION**

A jury found Appellant Andrew Martinez guilty of the first-degree felony offense of murder and assessed his punishment at forty-five years' imprisonment. In a single issue, Appellant argues that the evidence supporting the jury's finding during the punishment phase of trial that he did not act under the influence of sudden passion is legally and factually insufficient. We affirm the trial court's judgment.

**Background**

On September 14, 2016, Appellant Andrew Martinez ("Appellant") shot and killed Jacob Lambert ("Lambert") in Kyle, Texas. Appellant was charged with first-degree murder. Appellant's first trial resulted in a hung jury. At his second trial, Appellant pleaded "not guilty" to the charge by reason of self-defense.[2] This time, the jury rejected Appellant's claim of self-defense and found him guilty of first-degree murder. During the punishment phase of his second trial, Appellant argued that the jury should assess his punishment for a second-degree felony, as opposed to a first-degree felony, because he had proven by a preponderance of the evidence that "he caused the death [of Lambert] under the immediate influence of

---

[2]     Appellant appeals from the final judgment in the second trial. All references to trial testimony and arguments raised concern the second trial, unless otherwise noted.

sudden passion arising from an adequate cause."[3] *See* TEX. PENAL CODE § 19.02(d).[4]

The jury rejected Appellant's assertion of sudden passion and assessed his punishment for a first-degree felony offense. On appeal, Appellant challenges only the jury's rejection of his claim of sudden passion. Although sudden passion is relevant only with respect to punishment, we consider all evidence adduced at trial when evaluating the sufficiency of the evidence with respect to this issue. *See generally Atkinson v. State*, 404 S.W.3d 567, 572 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd) ("By operation of law, the evidence admitted during the guilt-innocence phase of the trial is also before the jury at the penalty phase, and the jury may consider all the evidence adduced at the guilt-innocence phase in assessing a defendant's punishment.").

## A.  State's Witnesses[5]

The State called Brandon Corey Tyner, Ebony Esquivel, Aimee Johnson, and Victoria Gonzalez to testify during the guilt-innocence phase of Appellant's trial.

---

[3]   The punishment range for first degree felony is life or a term not more than ninety-nine years or less than five years. TEX. PENAL CODE § 12.32(a). The punishment range for second degree felony is not more than twenty years or less than two years. TEX. PENAL CODE § 12.33(a).

[4]   Texas Penal Code §19.02(d) provides that at "the punishment stage of a trial, the defendant may raise the issue as to whether he caused the death under the immediate influence of sudden passion arising from an adequate cause. If the defendant proves the issue in the affirmative by a preponderance of the evidence, the offense is a felony of the second degree." TEX. PENAL CODE §19.02(d).

[5]   The State called thirty-one witnesses during the guilt-innocence phase of Appellant's second trial, but only four of them witnessed the shooting: Victoria

3

### 1.    Brandon Corey Tyner

Brandon Corey Tyner ("Tyner"), Lambert's friend, testified at trial. Tyner testified he knew Bradley Wood ("Wood") and that he would provide him with marijuana and cocaine. Wood would then sell the drugs and return the proceeds to Tyner.

On September 14, 2016, Tyner, Lambert, and Tyner's cousin, Blake Ladd ("Ladd"), drove to a gas station in Lambert's white Impala where Tyner fronted Wood $50 worth of cocaine. Wood was driving a blue Mustang. Tyner testified that as he walked up to the Mustang to give Wood the cocaine, he saw Appellant sitting in the front passenger seat. After leaving the gas station, Tyner, Lambert, and Ladd drove to Ladd's home at 120 Myrtle Street in Kyle, Texas. Myrtle Street runs approximately north to south and dead ends at Tower Drive. Ladd's home is the second home from Tower Drive on the left. At trial, the State introduced Exhibit No. 1 depicting Myrtle Street at the intersection of Tower Drive:[6]

---

Gonzalez, Brandon Corey Tyner, Ebony Esquivel, and Aimee Johnson. Appellant, who testified in his own defense, called an expert witness to testify on his behalf. With respect to the punishment phase of trial, the State called twelve witnesses, but none of them witnessed the shooting, and Appellant did not call any witnesses. We thus limit our analysis to testimony provided during the guilt-innocence phase by Victoria Gonzalez, Brandon Corey Tyner, Ebony Esquivel, Aimee Johnson, and Appellant.

[6]    State's Exhibit 1 does not depict the intersection, the location of Wood's Mustang, or the location of Lambert's Impala on the day of the shooting.



State's Exhibit 1.

Tyner and Wood arranged to meet later that evening a few houses down the street from 120 Myrtle so that Wood could give Tyner the proceeds from the drug sales. When Wood arrived at Myrtle Street that evening, he parked his Mustang facing Tower Drive on the left side of Myrtle Street between 130 Myrtle Street and 140 Myrtle Street. Wood was in the driver's seat and Appellant was in the front passenger seat. Tyner did not notice if anyone was in the backseat.

Tyner exited Ladd's house to meet Wood outside. According to Tyner, Lambert was either with him when he walked out of the house or close behind. Tyner testified that he and Lambert approached Wood's Mustang and stood together at the driver's side window and were leaning in slightly. Tyner denied that Lambert hid behind anything when he approached the Mustang. According to Tyner, Appellant and Lambert began arguing and both men "sounded angry, and they were

5

yelling at each other and cursing at each other." Tyner did not recall who started the argument. According to Tyner, Appellant and Lambert were gesturing with their hands as they argued, and the two men appeared to be "equally mad." Tyner testified that neither he nor Lambert had any kind of gun with them that day and Tyner had never seen Lambert with a gun. He also denied that Lambert was "holding anything up, either out of his clothing or in his clothing, with either of his hands" during the argument. Tyner, who had a good view of Lambert's waistband, testified he did not see anything sticking out of Lambert's waistband or "anything on his person that could have been a weapon, like, a lump or something in his pocket." Lambert also did not have "any kind of, like, backpack or hiding place when he came out of the house and approached the car with you where he could have hid[den] a weapon." Tyner testified that Lambert told Appellant that "he wanted to fight him" but Lambert did not threaten to use a weapon against Appellant and Lambert never mentioned a gun, knife, or club. According to Tyner, Lambert was only proposing a fistfight. Tyner testified that Appellant appeared angry and upset during the argument, but he never appeared to be afraid of Lambert and he did not say he was afraid of Lambert.

Tyner testified that based on his observations of Appellant's and Lambert's interaction, he did not see a reason other than the proposed fistfight for Appellant to fear Lambert, fear for his life, or fear Lambert would use deadly force. According

6

to Tyner, the argument ended when Wood drove away in his Mustang towards Tower Drive. He testified that although Lambert swore at the Mustang, he did not try to stop it from leaving. When the Mustang drove off, Tyner and Lambert started walking back towards Ladd's house on 120 Myrtle. Lambert, who was walking in front of Tyner, was "throwing up middle fingers" in the Mustang's direction. According to Tyner, when the Mustang reached the intersection of Myrtle Street and Tower Drive, the Mustang made a U-turn and drove back down the street in Tyner's and Lambert's direction. Tyner testified that the Mustang slowed down and he then heard four or six shots and saw "flashes" coming from the Mustang's passenger side, and Lambert was shot. According to Tyner, Lambert was "just holding up a middle finger" right before he was shot. Tyner testified that Lambert was swearing but he was not reaching in his pocket or towards his waistband or doing or saying anything threatening before the shots were fired. Tyner testified that based on his observations, Lambert was not doing anything when the shooting occurred that "would justify another person being in fear for their life." After the shooting, the Mustang sped up and drove away.

### 2. Bradley Wood

Wood testified that he delivered drugs for Tyner in exchange for gas money or drugs. On September 14, 2016, Wood drove to Myrtle Street in his Mustang to meet with Tyner because he needed to give Tyner the proceeds from a drug delivery

7

he had completed earlier that day. Appellant was sitting in the front passenger seat of the Mustang and Ebony Esquivel ("Esquivel") and Aimee Johnson ("Johnson") were sitting in the backseat. When they arrived at Myrtle Street, Wood parked his Mustang next to the curb on the left side of Myrtle Street, facing Tower Drive. Tyner exited Ladd's house and walked up to the driver's side window of the Mustang, where he and Wood completed their transaction. According to Wood, he and Tyner spoke for about a minute before Lambert walked up to the driver's side window of the Mustang, at which point Lambert got into an argument with Appellant. According to Wood, Lambert did not hide behind anything as he approached the Mustang. Wood, who did not know what Lambert and Appellant were arguing about, did not recall what Lambert or Appellant said during their argument. According to Wood, Lambert and Appellant were both upset and angry and the argument lasted about a minute.

Wood testified that Lambert never put his body inside the Mustang. He also did not see Lambert with a gun or see anything suspicious in Lambert's pockets or waistband. He did not recall hearing Lambert threaten Appellant with a firearm and Appellant did not appear to be scared of Lambert. According to Wood, Appellant never told him he was scared of Lambert. Wood testified that he did not "observe anything that would lead you to believe [Appellant] had some reason to be afraid that [Lambert] was going to seriously harm him."

8

The argument ended when Appellant told Wood to leave, and Wood drove away in the Mustang down Myrtle Street toward Tower Drive. Wood denied that Lambert was hanging on to the Mustang yelling "Come back here, you pussies," when he drove away. Wood, who did not know the neighborhood very well, testified that he could have turned left on Tower Drive to leave the neighborhood, but he was unaware of that possibility the night of the shooting. Instead of turning onto Tower Drive, Wood made a wide U-turn at Tower Drive and drove back down Myrtle Street so that he could take the same route out of the neighborhood. Wood denied hearing Appellant telling him to turn left on Tower Drive.

After making the U-turn and as he was driving back down Myrtle Street, Wood saw Lambert and Tyner walking towards Tower Drive and towards the Mustang. Wood then heard Appellant, who was sitting in the front passenger seat, fire several shots out the passenger side window. Wood did not recall Appellant saying anything before the shooting and believed the Mustang had already driven by Tyner and Lambert when the shooting occurred.

Wood testified that Lambert and Tyner were not doing "anything threatening" as they walked towards Tower Drive and the Mustang, and he did not "perceive any reason that [Appellant] would have to be fearful" of either Tyner or Lambert. According to Wood, Lambert was not holding anything, making threatening

9

gestures, or reaching into his pockets when Appellant fired the shots. Wood agreed that Appellant "would have been just fine" if he had not shot Lambert.

After the shooting, the Mustang fled the scene. Appellant began giving Wood directions and telling him where to drive. Wood testified that he was scared and just followed Appellant's instructions. At some point, Appellant threw the gun out the window. The police stopped the Mustang shortly after and detained Wood, Appellant, Esquivel, and Johnson.

### 3.    Ebony Esquivel

Esquivel, who was sitting in the backseat of the Mustang when the shooting occurred, testified that Wood and Appellant picked her up at her home on September 14, 2016, and then they picked up Esquivel's friend, Johnson. According to Esquivel, Wood was driving his Mustang, Appellant was sitting in the front passenger seat, she was sitting behind Wood, and Johnson was sitting behind Appellant. After making a few stops, the group drove to Myrtle Street where Esquivel believed Wood was going to meet a friend.

Esquivel testified that when they arrived at Myrtle Street, Tyner walked up to the Mustang's driver's side window and started talking to Wood. Esquivel, who was talking to Johnson in the backseat, was not paying attention to Tyner's and Wood's conversation. At some point, Lambert walked up to the driver's side window. According to Esquivel, Lambert leaned in the car and said hello to her and Johnson

10

before he started talking to Appellant. She described Appellant's and Lambert's conversation as "aggressive" and she testified that Lambert, who initiated the conversation, was "just kind of angry" and his voice was raised. Esquivel testified that Appellant told her earlier that night that he did not like Lambert because Lambert had robbed his brother. Lambert and Appellant were "equally upset" and they were swearing and threatening one another. When asked what threats Lambert was making, Esquivel testified, "Like, that he'll mess [Appellant] up, or something like that." Appellant retorted that "he wasn't scared." When asked what she thought Lambert meant when he said he wanted to mess Appellant up, Esquivel testified that she thought Lambert was referring to a fistfight.

On cross-examination, Esquivel testified that Lambert called Appellant "a bitch" and threatened him, saying, "This is not my first time. I can fuck you up." Esquivel agreed that "it seemed like [Lambert] wanted to get [Appellant] out of the car." When asked if she thought Lambert was "trying to scare" Appellant, Esquivel testified that Lambert was "just trying to, like, fight him, like, fistfight him."

According to Esquivel, Lambert never mentioned a gun or a firearm of any kind or threatened deadly force against Appellant. When asked if it appeared to her that Lambert was "holding anything up or securing anything in his clothing with his hands," Esquivel testified that he was not, and she never saw Lambert with a gun

11

that night. She also never feared for Appellant's life or was "afraid that [Lambert] was going to use any kind of deadly force against him."

According to Esquivel, the argument ended when she told Wood that it was time to go, and Wood drove away on Myrtle Street towards Tower Drive. Esquivel testified that Lambert tried unsuccessfully to hang on to the Mustang to stop them from leaving. Wood made a U-turn at Tower Drive and drove back down Myrtle Street. Esquivel testified that Appellant did not say anything to anyone when Wood made the U-turn. Esquivel saw Lambert standing in the driveway of 120 Myrtle after the Mustang turned around and Lambert had "his hands up, like, stretched out." When asked how she interpreted Lambert's gesture, Esquivel testified, "He wanted to know why we left, I guess." Esquivel also did not see Lambert "reach for his waistband" or "point anything at the car." She also did not "see any gestures that someone could have interpreted as reaching for a weapon." When asked if she thought Lambert was "threatening any kind of force against [her] or any other person in the car," Esquivel answered, "No." According to Esquivel, Lambert "just had his hands up in the air." Esquivel testified that if Lambert "had pulled a gun out at that moment," she would have seen it "because she was "looking at him when we were driving down the street."

Esquivel testified that, as the Mustang drove back down Myrtle Street, Appellant "pulled out a gun out of his backpack and fired several shots out the

12

passenger side window." As the Mustang drove by Lambert on its way out of the neighborhood, Esquivel did not fear for her personal safety or the personal safety of Wood, Johnson, or Appellant. She also did not perceive any reason why Appellant would have been fearful of Lambert when he shot him. She testified that Lambert did nothing that evening to lead her to believe Appellant was "in fear for his life" when he shot Lambert.

When asked if Appellant said anything "either before or immediately after the shooting," Esquivel testified that after he shot Lambert, Appellant stated that Lambert "deserved it."

### 4. Aimee Johnson

Johnson testified that Wood, Appellant, and Esquivel picked her up in Wood's Mustang on September 14, 2016. According to Johnson, Wood was driving, Appellant was sitting in the front passenger seat, Esquivel was seated in the backseat behind Wood, and she sat behind Appellant. Johnson testified that they stopped at Sonic for slushies and then drove to Myrtle Street where Johnson believed they were going to pick up another passenger. After the Mustang parked on the left side of Myrtle Street next to the curb, Tyner walked out of one of the homes and approached the Mustang's driver's side window. According to Johnson, Tyner spoke to Wood for "a minute or two" before Lambert approached the car. Johnson did not see Lambert until Tyner moved to the side and made room for him beside the driver's

side window. Lambert placed his arms on the window's ledge and leaned into the Mustang slightly to see who was in the car. Lambert, who knew Esquivel and Johnson, said hello to the two women and then Lambert noticed Appellant. Johnson testified that she could feel the tension in the air when Lambert saw Appellant sitting in the front passenger seat. According to Johnson, Lambert's "face kind of dropped" and he seemed surprised to see Appellant. Lambert began arguing with Appellant. According to Johnson, Lambert "said something about there [being] some drama with his brother, and then [Appellant] [] said something else about the drama with his brother." Johnson did not otherwise know what the men were arguing about. Both Appellant and Lambert were "upset," "hostile," and "angry," and although their voices were "elevated, they were not shouting." At some point during the argument, Lambert stood up, but he still had his hand on the driver's side windowsill.

Johnson testified that she did not see Lambert with "any kind of gun" or a weapon that night or see Lambert "make any movements like he was reaching for a weapon." Johnson could see Lambert's waistband when he stood up and if Lambert had anything in his waistband, she would have been able to see it. She also did not recall seeing "any suspicious lumps or items in the waistband that would lead [her] to believe or anyone to believe that [Lambert] had a weapon on him." According to Johnson, Lambert did not "threaten to harm the [Appellant] with a gun" during their argument or make any specific threats against Appellant. Johnson testified that

14

Lambert did not mention a gun or tell Appellant to do anything, and she denied hearing Lambert call Appellant "a bitch," or telling Appellant, "This isn't my first time. I can fuck you up." Johnson, who was seated behind Appellant, testified that Appellant did not sound fearful during the argument, just upset, and he never mentioned anything about being afraid of Lambert. Based on her observations, Johnson did not think there was "any reason for the [Appellant] to be in fear from [Lambert]."

Johnson testified that the argument ended when Wood drove away in the Mustang. According to Johnson, Lambert "tried to wrap his arm into the window onto the door as the car was taking off." Lambert hung on for no more than ten seconds and Johnson assumed he fell. Johnson denied hearing Lambert yell, "Don't leave, you pussies."

Johnson also testified that she did not hear anyone in the Mustang say anything before Wood made a U-turn at Tower Drive. On cross-examination, however, Johnson acknowledged that she told the police the night of the shooting that she heard Appellant tell Wood to "[t]urn left" as the Mustang approached Tower Drive.

As the Mustang drove back down Myrtle Street in Lambert's and Tyner's direction, Johnson heard Wood say, "Get him." Appellant then "pulled out his gun" and said, "You better not say shit." Appellant pointed the gun out the passenger side

15

window and fired several shots and, as the Mustang was driving away, Appellant "pointed [the gun] into the sky and shot a couple more times." When Appellant started shooting out the window, Johnson did not feel in danger or feel that Appellant was in any danger. Johnson, who did not see Lambert after the Mustang made the U-turn, did not believe that Appellant was "justified in doing what he did."

Johnson testified that she and Esquivel were terrified after the Mustang left the scene, and Wood "was kind of freaking out" and "[h]e kept telling everyone to shut up." According to Johnson, Wood was "just driving" and he did not seem to have a destination in mind. Johnson testified that at some point, while they were still driving, Appellant "eventually ends up saying, 'It was me. It was me.' Like, 'It's fine.'" She testified Appellant also stated that he "need[ed] to find water to throw the gun." When asked if Appellant said anything about Lambert, Johnson testified that Appellant said, "Fucking Lambert. Fucking Lambert" and "That's what he gets for messing with my family."

### 5. Victoria Gonzalez [3 RR 64]

Victoria Gonzalez ("Gonzalez") lived at 111 Myrtle Street in Kyle, Texas, which is located at the corner of Myrtle Street and Tower Drive. Gonzalez's home is catty-corner from the home at 120 Myrtle Street, where the shooting occurred.

On September 14, 2016, Gonzalez was returning home from the store at 10:00 p.m. when she heard people arguing across the street. Gonzalez looked out her front

16

window and saw a Mustang make a U-turn at the intersection of Myrtle Street and Tower Drive, and she saw Lambert standing in the driveway of 120 Myrtle Street. As the Mustang drove back down Myrtle Street, Gonzalez heard six gunshots and saw muzzle flashes coming from the car's passenger side. Although she could not recall if Lambert was doing anything with his hands before he was shot, Gonzalez testified that she probably would have noticed if Lambert had been doing "something unusual or threatening with [his] hands." Gonzalez testified that to the best of her recollection, Lambert was not "doing anything threatening." Gonzalez testified that Lambert was not pointing anything at the Mustang when it drove by and the shots were fired.

## B. Appellant's Witnesses

Appellant testified in his own defense. Appellant, a small-time drug dealer, did not have a car when the shooting occurred. On September 14, 2016, he texted Wood and asked him to pick him up so that Appellant could give Wood gas money for helping Appellant deliver marijuana. After Wood picked him up, they made one delivery and then drove to Taco Bell where Wood bought $20 of cocaine from Tyner. Appellant noticed that Tyner was driving Lambert's white Impala and Lambert, who was in the car, shot Appellant the middle finger. Appellant and Wood met up with Tyner later at Gregg-Clarke Park because Wood wanted Tyner to front him more cocaine. Wood planned to sell the cocaine and later to return the proceeds to Tyner.

17

After Tyner gave Wood the cocaine, Appellant noticed that Lambert was at the park as well and Lambert shot Appellant the middle finger. Appellant testified that this time, he "shot the finger at [Lambert], and I just kind of, like, brushed him off, you know." Later that day, Wood and Appellant picked up Esquivel and Johnson and they went to Sonic for slushies. While they were at Sonic, Wood received a phone call and they then drove to Myrtle Street.

According to Appellant, Wood parked the Mustang on the left side of the street between 130 Myrtle and 140 Myrtle. Wood, who was already outside, approached the parked Mustang first and Lambert joined Tyner a short time later. Although the interaction was initially friendly, things took an "unsettling" turn when Appellant saw a door at 120 Myrtle open and close. Appellant testified that out of the corner of his left eye, he saw someone sneaking around a vehicle parked in the driveway of 130 Myrtle and approaching the Mustang. Appellant testified that he became scared when he realized it was Lambert because Lambert was "acting sneaky" and "being weird." According to Appellant, Lambert pushed Tyner aside and stuck his head through the Mustang's driver's side window. Lambert noticed Esquivel and Johnson in the back seat first and then he noticed Appellant in the passenger seat and locked eyes with him.

According to Appellant, Lambert immediately threatened Appellant stating, "You're the punk ass motherfucker that tried to check me at the convenience store."

18

Appellant testified that this made him feel "scared" and "nervous" and he tried to tell Lambert he did not want to fight him, he had only wanted Lambert to fight his brother when they met up at the corner store. According to Appellant, Lambert responded, "Fuck that. Get your bitch ass out of the car. I'm gonna get you right now." Appellant testified that as Lambert was making his threat, Lambert was "pointing to me and he's - - when he does that, he shows me a handle of what I believed to be at the time a sawed-off shotgun. It looked like a - - the handle that I've seen before on - - in a photo of him." Appellant testified that he told Wood to drive away when he thought he saw the shotgun's handle. At that point, Lambert said something to Tyner, and Tyner walked away. Lambert, who had begun pacing outside the driver's side window, stuck his head in the window and stated, "This is not the first time -- this is not my first time. I've done this before." According to Appellant, he told Wood they needed to "get out of here before something bad happens to us."

According to Appellant, Wood drove away quickly as Lambert briefly hung on to the side of the Mustang's window in an unsuccessful attempt to keep the car from leaving. As they were driving away in the Mustang, Appellant pulled out his cell phone to get the address for the next marijuana delivery. Appellant testified that, as they approached the intersection of Myrtle Street and Tower Drive, Wood stated that Lambert had "called us some fucking pussies," and announced, "Man,

19

fuck that. I'm turning around." Appellant's "stomach turn[ed]" and his "heart drop[ped]" when he realized Wood was going to make a U-turn at Tower Drive to head back down Myrtle Street, and Appellant, who knew the way out the neighborhood, testified that he told Wood, "No. Go left. Go left."

As the Mustang made the U-turn, Appellant claims he saw Lambert waving his hands in the air and "[a]cting erratically." Appellant retrieved a loaded, and cocked handgun from his backpack on his lap. After he saw Lambert "real quickly reach for his waistband with his right hand," Appellant "just start[ed] shooting" because he believed Lambert was reaching for the sawed-off shotgun he had flashed earlier at Appellant. Appellant testified that he was "just trying to neutralize" Lambert and "make him just stop what he was doing." Appellant testified that he shot once or twice and as the Mustang passed Lambert. He testified he saw Lambert "pulling something out" and "fumbling for something" that Appellant believed was the shotgun, so he continued shooting. Appellant admitted, however, that he never actually saw Lambert with a gun before shooting. Appellant denied saying, "Y'all better not say shit," right before he shot Lambert.

As the Mustang fled that scene, Appellant, Wood, Esquivel, and Johnson were "scared" and "panicking." Appellant testified that he tried to calm everyone down and told them, "It's going to be okay. I didn't shoot him for no reason. He deserved it." Appellant explained that Lambert "deserved it" because he "reached for his

20

waistband." Although he admitted that he said, "Fucking Lambert," Appellant denied saying, "You messed with the wrong family." Appellant testified that while they were driving around after the shooting, the Mustang passed a Hays County Deputy who turned around and ultimately stopped the car. The Deputy detained Appellant, Wood, Esquivel, and Johnson. Appellant testified he threw the gun out the window after he saw the deputy turn his car around to follow the Mustang.

On cross-examination, the State questioned Appellant about discrepancies between his current testimony and the testimony he gave during his first trial. Appellant acknowledged that although he had just testified that Lambert showed him the handle of what Appellant thought was a sawed-off shotgun, Appellant testified at his first trial that he had not seen a firearm. When asked about Lambert's reference to an incident that had happened earlier at the corner store, Appellant testified that he, his brother, and some friends encountered Lambert and others at a Shell convenience store. Appellant approached Lambert and tried to arrange for Lambert to fight Appellant's brother at a nearby park. At some point, a man Lambert had been talking to pulled out a knife and Appellant responded by brandishing his handgun.

## C.    Punishment

The jury rejected Appellant's self-defense claim and found Appellant guilty of first-degree murder. During the punishment phase of trial, Appellant argued that

21

the jury should access his punishment for a second-degree felony, as opposed to a first-degree felony, because he had proven by a preponderance of the evidence that "he caused the death [of Lambert] under the immediate influence of sudden passion arising from an adequate cause." *See* TEX. PENAL CODE § 19.02(d).

The State called twelve witnesses, none of whom witnessed the shooting. Appellant did not call any witnesses to testify on his behalf. In the jury charge, the trial court instructed the jury about the mitigating circumstance of sudden passion:

> The defendant contends he committed the murder under the immediate influence of sudden passion arising from an adequate cause. Before you assess punishment, you must first determine whether the defendant has proven this contention.
>
> A defendant convicted of murder may raise the issue of whether he caused the death under immediate influence of sudden passion arising from an adequate cause. This is called the doctrine of sudden passion.
>
> If the defendant proves that he acted under the influence of sudden passion, this offense is punishable by a term of imprisonment for no fewer than 2 years and no more than 20 years and a fine of no more than $10,000.[7]
>
> If the defendant does not prove he acted under the influence of sudden passion, this offense is punishable by a term of imprisonment for no less than 5 years and no more than 99 years or for life and a fine of no more than $10,000.[8]

---

[7]     This is the punishment range for a second-degree felony. TEX. PENAL CODE § 12.33(a) (stating punishment range for second degree felony is not more than twenty years or less than two years).

[8]     This is the punishment range for a first-degree felony. TEX. PENAL CODE § 12.32(a) (stating punishment range for first degree felony is life or term not more than ninety-nine years or less than five years).

You must all agree on whether the defendant has proved that he acted under the influence of sudden passion.

The burden is on the defendant to prove, by a preponderance of evidence, that he acted under the influence of sudden passion.

Sudden passion means passion directly caused by or -- and arising out of provocation by the individual killed or another acting with the person killed, which passion arises at the time of the offense and is not solely the result of former provocation.

Adequate cause means cause that would commonly produce a degree of danger -- excuse me -- anger, rage, resentment, or terror in a person of ordinary temper sufficient to render the mind incapable of cool reflection.

The term preponderance of evidence means the greater weight of the degree -- and degree of the credible evidence.

You must determine whether the evidence has -- excuse me -- the defendant has proved, beyond a preponderance of evidence, that he acted under the immediate influence of sudden passion arising from an adequate cause.

You must also agree on whether the defendant has proved sudden passion before you may assess punishment.

Your resolution of the special issue will determine which of the verdict forms you will use.

The jury rejected Appellant's assertion of sudden passion and assessed his punishment at forty-five years' imprisonment for a first-degree felony offense.

## Sudden Passion

In his sole issue, Appellant argues that the evidence supporting the jury's negative finding on his claim of sudden passion is legally and factually insufficient. Appellant argues that "the evidence given at trial unequivocally establishes that his

actions were directly caused by and arose out of provocation by Jacob Lambert; and that the Appellant did not have the opportunity to even attempt to engage in a cool reflection." Appellant further contends that "the provocation giving rise to sudden passion was entirely what happened after the Appellant pulled out his phone" to get directions for the next marijuana delivery.

## A.    Applicable Law

At the punishment phase of a murder trial, a defendant may reduce a murder charge from a first-degree felony to a second-degree felony by establishing he committed the murder under the immediate influence of sudden passion. Pursuant to Texas Penal Code section 19.02(d), a "defendant may raise the issue as to whether he caused the death under the immediate influence of sudden passion arising from an adequate cause. If the defendant proves the issue in the affirmative by a preponderance of the evidence, the offense is a felony of the second degree." *See* TEX. PENAL CODE § 19.02(d); *see generally McKinney v. State*, 179 S.W.3d 565, 569 (Tex. Crim. App. 2005) (stating "[s]udden passion is a mitigating circumstance" that can be raised during punishment phase).

"Sudden passion" is defined as "passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation." TEX. PENAL CODE § 19.02(a)(2). "Adequate cause" is defined as

24

"cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." *Id.* § 19.02(a)(1); *see also McKinney*, 179 S.W.3d at 569 (stating sudden passion requires proof of adequate provocation, that "passion or an emotion such as fear, terror, anger, rage, or resentment existed[;] that the homicide occurred while the passion still existed and before there was reasonable opportunity for the passion to cool; and that there was a causal connection between the provocation, the passion, and the homicide").

Ordinary anger or fear alone does not rise to the level of sudden passion arising from adequate cause. *Moncivais v. State*, 425 S.W.3d 403, 407 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd); *see also Gonzales v. State*, 717 S.W.2d 355, 357 (Tex. Crim. App. 1986) ("For a claim of fear to rise to the level of sudden passion, the defendant's mind must be rendered incapable of cool reflection."). "Anticipation of an event and preparation of a response indicates a defendant had time to deliberate over an action and did not act under the immediate influence of sudden passion." *Moncivais*, 425 S.W.3d at 407; *see also Nance v. State*, 807 S.W.2d 855, 863 (Tex. App.—Corpus Christi 1991, pet. ref'd) (stating evidence of premeditation is sufficient to support finding of no sudden passion). Although sudden passion must arise at the time of the offense and cannot result solely from former provocation, the "victim's past conduct . . . can help place in context the

victim's provocation at the time of the offense." *Romine v. State*, No. 03-03-00330-CR, 2006 WL 903730, at *4 (Tex. App.—Austin Apr. 6, 2006, pet. ref'd) (mem. op., not designated for publication).

## B.      Legal Sufficiency

### 1.      Standard of Review

In *Brooks v. State*, 323 S.W.3d 893 (Tex. Crim. App. 2010), the Court of Criminal Appeals held that the *Jackson v. Virginia*, 443 U.S. 307 (1979) standard of review is the only standard a court may apply to determine whether the evidence is sufficient to support each element of a criminal offense on which the State bears the burden of proof beyond a reasonable doubt. *Brooks*, 323 S.W.3d at 895 (citing *Jackson*, 443 U.S. at 319). When as here, however, the defendant bears the burden of proof by a preponderance of the evidence, we use a different standard and apply the civil legal sufficiency standard. *See Rankin v. State*, 617 S.W.3d 169, 184–85 (Tex. App.—Houston [1st Dist.] 2020, pet. ref'd) (applying civil standard to legal sufficiency review of jury's rejection of sudden passion claim). "Although the issue of sudden passion is a punishment issue, it is analogous to an affirmative defense because the defendant has the burden of proof by a preponderance of the evidence." *Gaona v. State*, 498 S.W.3d 706, 710 (Tex. App.—Dallas 2016, pet. ref'd).

The civil legal sufficiency standard involves a two-step analysis. *See Rankin*, 617 S.W.3d at 185; *Moncivais*, 425 S.W.3d at 407. First, we review the record for

26

any evidence that supports the jury's negative finding while ignoring all evidence to the contrary. *Rankin*, 617 S.W.3d at 185. Second, if no evidence supports the negative finding, then we examine the entire record to determine whether the evidence establishes the affirmative defense. *Id.* We defer to the fact finder's determination of the weight and credibility to give the testimony and the evidence at trial. *Id.*

### 2. Briefing Waiver

To assert an issue on appeal, an appellant's brief "must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." TEX. R. APP. P. 38.1(i). An appellant waives an issue on appeal if he does not provide supporting arguments, substantive analysis, and appropriate citations to authorities and to the record. *See id.*; *Cardenas v. State*, 30 S.W.3d 384, 393 (Tex. Crim. App. 2000). An appellate court has no obligation to construct and compose issues, facts, and arguments with appropriate citations to authorities and the record for the appellant. *See Wolfe v. State*, 509 S.W.3d 325, 343 (Tex. Crim. App. 2017). A brief that does not apply the law to the facts does not comply with Texas Rule of Appellate Procedure 38.1 and presents nothing for our review. *See Swearingen v. State*, 101 S.W.3d 89, 100 (Tex. Crim. App. 2003).

Although Appellant states in the "Issues Presented" section of his brief that the evidence is legally and factually insufficient to support the jury's negative

finding on his claim of sudden passion, his brief focuses exclusively on his argument that the evidence is factually insufficient to support the jury's finding. Appellant does not identify the standard of review for a challenge to the legal sufficiency of the evidence with respect to sudden passion or attempt to apply the law to the facts of this case. We thus hold that to the extent Appellant seeks to raise a legal sufficiency challenge, he waived the issue and presented nothing for our review. *See* TEX. R. APP. P. 38.1(i); *Swearingen*, 101 S.W.3d at 100.

### 3.    Analysis

Even if Appellant had preserved his legal sufficiency challenge, he still would not prevail. The holding in *Gaona v. State*, 498 S.W.3d 706 (Tex. App.—Dallas 2016, pet. ref'd), where the court held there was legally sufficient evidence supporting the jury's negative finding on the defendant's claim of sudden passion, is instructive. *Id.* at 711. In that case, an eyewitness testified that the angry victim approached the defendant's car and insisted the defendant get out and fight him. *Id.* at 707. When the defendant refused, the victim called the defendant a "chicken," slapped the defendant's windshield, and cursed as he walked away. *Id*. The defendant got out of his car brandishing a pistol, walked towards the victim, and shot him seven times. *Id.* at 708. A second eyewitness corroborated the first witness' testimony. *Id.* Both witnesses testified that the victim's hands were empty when he was shot and neither witness heard the victim threaten to kill the defendant. *Id.*

28

At trial, the defendant testified that after he refused to fight the victim, the victim threatened to kill him and "reached for his hip pocket as if to grab a gun, but nothing was there." *Id.* The victim then turned away and as he was walking towards the house, he stopped at a parked car and tried to open the door, but it was locked. *Id.* The victim then looked back at the defendant and threatened to kill him. *Id.* The defendant testified that he knew the victim owned a gun because he had seen it months before. *Id.* After concluding there was no way to leave, the defendant grabbed his gun and got out of his car. One of the eyewitnesses tried to take the gun from the defendant and when the victim "stepped forward" towards the defendant, the defendant shot him. *Id.* The defendant testified that "he did not know whether [the victim] had a gun because [the victim] was unable to get into the car, but he shot [the victim] because he saw [the victim] was coming towards him and 'feared' what [the victim] would do." *Id.*

In analyzing the legal sufficiency of the evidence supporting the jury's negative finding on the defendant's claim of sudden passion, the appellate court relied on the eyewitnesses' testimony that the victim demanded to fight the defendant and walked away cursing after the defendant refused. *Id.* at 711. At that point, the defendant got out of his car, approached the victim, and shot him seven times. *Id.* at 711. Neither eyewitness saw the victim with a gun nor heard him threaten to kill the defendant. The appellate court held that the undisputed evidence

29

that the victim "yelled at, argued with, cursed at, and demanded to fight" the defendant did not amount to an adequate cause to support a finding of sudden passion. *Id.*; *see McKinney*, 179 S.W.3d at 570 (concluding victim's yelling at and pushing of defendant did not "rise to the level of adequate cause"). Based on the eyewitnesses' testimony, the appellate court held there was legally sufficient evidence supporting the jury's negative finding on the claim of sudden passion. *Gaona*, 498 S.W.3d at 711.

We hold the same is true here. Wood testified that he saw Lambert and Tyner as he drove back down Myrtle Street after making a U-turn, and Lambert was not holding up anything, making threatening gestures, or reaching into his pockets. According to Wood, neither Lambert nor Tyner did anything Wood would perceive as threatening, and Wood did not see any reason why Appellant would have to be fearful of either man.

Esquivel testified that after the Mustang made a U-turn at Tower Drive, she saw Lambert standing in a driveway with "his hands up, like, stretched out." When asked how she interpreted Lambert's gesture, Esquivel testified, "He wanted to know why we left, I guess." Esquivel testified that she did not see Lambert "reach for his waistband," "point anything at the car," or make "any gestures that someone could have interpreted as reaching for a weapon." Esquivel testified that after he shot Lambert, Appellant stated that Lambert "deserved it." Like Wood, Esquivel

30

did not perceive any reason why Appellant would have been fearful of Lambert when he shot him, and Lambert did not do anything that evening that led her to believe Appellant was "in fear for his life" when he shot Lambert.

Tyner testified that Lambert was cursing and "just holding up a middle finger" right before he was shot. According to Tyner, Lambert was not reaching in his pocket or towards his waistband or doing or saying anything threatening. Tyner testified that based on his observations, Lambert was not doing anything when the shooting occurred that "would justify another person being in fear for their life."

Gonzalez, who witnessed the events from across the street, testified that she saw Lambert standing in the driveway of 120 Myrtle when the Mustang turned around. She testified that Lambert was not doing anything unusual or threatening with his hands.

Wood, Esquivel, Gonzalez, and Tyner—the four eyewitnesses who saw Lambert immediately before he was shot—testified that Lambert was not holding anything in his hands, reaching into his pockets or waistband, or making threatening gestures that someone could have interpreted as reaching for a weapon. It is undisputed that no weapon was ever found on Lambert, and, as Appellant acknowledges on appeal, Lambert was unarmed when the shooting occurred. At most, the evidence reflects that Lambert was just cursing and "holding up a middle finger" before he was shot. This is insufficient to establish adequate cause. *See*

31

*Gaona*, 498 S.W.3d at 711 (holding victim's yelling at, arguing with, cursing at, and demanding to fight defendant did not "amount to an adequate cause to support a finding of sudden passion"); *see also McKinney*, 179 S.W.3d at 570 (concluding victim's yelling at and pushing of defendant did not "rise to the level of adequate cause"). The trial testimony from Wood, Esquivel, Gonzalez, and Tyner concerning Lambert's conduct immediately prior to the shooting is some evidence that Appellant was not acting in response to adequate provocation when he shot Lambert. *See id.* at 569 (stating sudden passion requires proof of adequate provocation).

Wood, Esquivel, and Tyner also agreed that Lambert did nothing after the Mustang made a U-turn at Tower Drive to give Appellant or anyone else in the Mustang a reason to fear for their life when the shooting occurred.[9] This testimony, which reflects that an ordinary person would not have perceived Lambert's conduct as threatening, is further evidence that Appellant was not acting in response to adequate provocation when he shot Lambert. *See id.* (stating sudden passion requires proof of adequate provocation); *see also* TEX. PENAL CODE § 19.02(a)(1) (defining "adequate cause" with respect to "a person of ordinary temper").

---

[9] Although Appellant contends that any testimony concerning his thoughts and feelings with respect to the shooting "should be ignored or treated as speculation," Appellant either did not object to such testimony at trial, or, if he objected, he is not challenging the overruling of such an objection on appeal. Therefore, we can consider such testimony for purposes of our sufficiency analysis.

32

Johnson, who did not see Lambert after the Mustang made a U-turn, testified that as the Mustang drove back down Myrtle Street in Lambert's direction, Johnson heard Wood say, "Get him." Appellant then took his already cocked handgun from his backpack and warned the other occupants that they "better not say shit." Johnson's testimony indicates that Appellant made a deliberate decision to shoot Lambert, and Appellant had sufficient forethought to anticipate the consequences of his actions by warning Wood, Esquivel, and Johnson not to talk to the police. *See Moncivais*, 425 S.W.3d at 407 ("Anticipation of an event and preparation of a response indicates a defendant had time to deliberate over an action and did not act under the immediate influence of sudden passion."). Esquivel also testified that Appellant told her earlier in the evening that he disliked Lambert because Lambert had robbed Appellant's brother, and after he shot Lambert, Appellant exclaimed Lambert "deserved it." Johnson also testified that after the Mustang fled the scene, Appellant said, "Fucking Lambert," and "That's what he gets for messing with my family." The jury could have reasonably inferred from Johnson's and Esquivel's testimony that Lambert's shooting was the result of a premeditated murder motivated by the ongoing animus between Appellant and Lambert, and not an act of sudden passion. *See Nance*, 807 S.W.2d at 863 (stating evidence of premeditation is sufficient to support finding of no sudden passion); *see also Hernandez v. State*, 127 S.W.3d 206, 213 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) ("Sudden

33

passion must arise at the time of the offense and cannot result solely from former provocation.").

Although disputed, the testimony from Wood, Esquivel, Gonzalez, Johnson, and Tyner is some evidence that, if believed, supports the jury's negative finding on the issue of sudden passion. As sole judge of the weight and credibility of the witness testimony, the jury was entitled to credit the testimony of Wood, Esquivel, Gonzalez, Johnson, and Tyner over Appellant's testimony, and, in doing so, reasonably conclude that Appellant was not acting under the immediate influence of sudden passion when he shot Lambert. *See Rankin*, 617 S.W.3d at 185 (stating courts defer to fact finder's determination of weight and credibility of testimony and evidence).

We hold that the evidence is thus legally sufficient to support the jury's negative finding of the issue sudden passion. *See id.* (stating first prong of legal sufficiency review requires court to review record for any evidence supporting jury's negative finding while ignoring all contrary evidence).

## C. Factual Sufficiency

### 1. Standard of Review

Although the Court of Criminal Appeals "abolished factual-sufficiency review as it applies to criminal convictions" on issues on which the State bears the burden of proof beyond a reasonable doubt, a fact finder's negative finding on an

issue on which the defendant bears the burden of proof by a preponderance of the evidence, such as sudden passion, may still be reviewed for factual sufficiency. *See Butcher v. State*, 454 S.W.3d 13, 20 (Tex. Crim. App. 2015) (upholding court of appeals' application of factual sufficiency standard of review to issue defendant bore burden to prove by preponderance of evidence); *Matlock v. State*, 392 S.W.3d 662, 671 (Tex. Crim. App. 2013) (stating civil standards of factual-sufficiency review apply to issues for which burden of proof is that of "preponderance of the evidence," because "preponderance of the evidence" is "same burden as in civil proceedings"); *see also Rankin*, 617 S.W.3d at 185–86 ("In reviewing an issue on which the defendant has the burden of proof by a preponderance of the evidence, we apply the factual-sufficiency standard in *Meraz v. State*, 785 S.W.2d 146, 154–55 (Tex. Crim. App. 1990) (en banc).").

In *Meraz v. State*, 785 S.W.2d 146 (Tex. Crim. App. 1990), the Court of Criminal Appeals held that in criminal cases in which a defendant challenges the factual sufficiency of the evidence to support a jury's negative finding on an issue on which the defendant bears the burden of proof, the standard of review is the same as the one used in civil cases. *Id.* at 154–55. We review all of the evidence in a neutral light to determine whether the verdict is so against the great weight and preponderance of the evidence as to be "manifestly unjust, conscience-shocking, or clearly biased." *Matlock*, 392 S.W.3d at 671. We must defer to the fact finder's

35

determination of the weight and credibility to give the testimony and the evidence at trial. *See Rankin*, 617 S.W.3d at 185; *see also Moncivais*, 425 S.W.3d at 409 ("We may not, however, intrude on the fact finder's role as the sole judge of the weight and credibility of the witnesses' testimony.").

## 2. Analysis

Relying exclusively upon his own trial testimony, Appellant argues that the evidence establishes he believed Lambert, who had just "curse[d] [at] him, threaten[ed] him [with] bodily harm, and attempt[ed] to stop a moving car," was in possession of a sawed-off shotgun, and "acting erratic and motioning his arms" as the Mustang drove towards Lambert. Appellant further contends that although he initially thought "he was out of danger and that they were leaving" when Wood drove away towards Tower Drive, that changed when Wood made a U-turn at Tower Drive, causing Appellant to "immediately [be] thrust back into a state of fear and confronted with an individual he knew wanted to physically hurt him and who he believed both had and was going for a sawed-off shotgun." According to Appellant, he "never had an opportunity for cool reflection" because it was only a matter of seconds between the time the Mustang made the U-turn and the shooting. "Having been thrust back into the path of the deceased, through no fault of his own, the Appellant formed the erroneous belief that Jacob Lambert was attempting to shoot him with a sawed-off shotgun. With only seconds to act and no opportunity to reflect

or contemplate the danger he perceived, the Appellant under the immediate influence of sudden passion shot and killed the deceased."

Appellant testified that he took out his cell phone to get the address for their next drug delivery after Wood drove away towards Tower Drive. As the Mustang approached the intersection, Wood said he was going to turn the car around because Lambert had called them "pussies." Appellant testified that his "stomach turn[ed]" and his "heart drop[ped]" when he realized Wood was going to make a U-turn because that meant they were "going back into a situation [he] just tried to avoid with a man -- a dude that's just acting very, very hazardous, very erratic." Although Appellant told Wood to take a left at the intersection, Wood made a U-turn and drove back towards Lambert. Appellant claims he saw Lambert waving his hands in the air and "[a]cting erratically" as the car was making the U-turn.

Appellant, who retrieved a loaded and cocked handgun from his backpack on his lap, claimed that he only had a moment to think after he saw Lambert "real quickly reach for his waistband with his right hand." Appellant testified that he "just start[ed] shooting" because he believed Lambert was reaching for the sawed-off shotgun. Appellant testified that he was "just trying to neutralize" Lambert and "make him just stop what he was doing." According to Appellant, he continued to shoot because he saw Lambert "pulling something out" and "fumbling for something" that Appellant believed was the shotgun. Appellant admitted, however,

37

that he never actually saw Lambert with a gun that night. Appellant also denied saying, "Y'all better not say shit," right before he shot Lambert.

Appellant testified that he was "scared" and "panicking" after the shooting and he tried to calm everyone down by telling them, "It's going to be okay. I didn't shoot him for no reason. He deserved it." Appellant explained that Lambert "deserved it" because he "reached for his waistband." Although he admitted that he said, "Fucking Lambert," Appellant denied saying, "You messed with the wrong family."

As previously discussed, Wood, Esquivel, Gonzalez, and Tyner testified that Lambert, who was unarmed, was not holding anything in his hands, reaching into his pockets or waistband, or making threatening gestures that someone could have interpreted as reaching for a weapon. According to Tyner, Lambert was just cursing and "just holding up a middle finger" before he was shot. Wood, Esquivel, and Tyner also agreed that Lambert did nothing after the Mustang turned around at Tower Drive that would give Appellant or anyone else in the Mustang a reason to fear for their life when the shooting occurred. Thus, the jury heard two conflicting versions of events surrounding the shooting: Appellant's version and everyone else's version. As sole judge of the weight and credibility of the witness testimony, the jury was entitled to credit the testimony of Wood, Esquivel, Gonzalez, Johnson, and Tyner over Appellant's testimony. *See Trevino v. State*, 157 S.W.3d 818, 822

(Tex. App.—Fort Worth 2005, no pet.) ("The jury was free to make its own determination of appellant's credibility and reject appellant's version of events if it did not believe he was telling the truth"). We must defer to the jury's resolution of these issues. *See Rankin*, 617 S.W.3d at 185 (stating courts defer to fact finder's determination of weight and credibility of testimony and evidence).

Viewing all of the evidence in a neutral light and deferring to the jury's determination of the weight and credibility of the testimony and evidence, we cannot say that the jury's negative finding on the issue of sudden passion is so weak as to be "manifestly unjust, conscience-shocking, or clearly biased" or against the great weight and preponderance of the evidence. *See Matlock*, 392 S.W.3d at 671; *Rankin*, 617 S.W.3d at 187.

**Conclusion**

We affirm the trial court's judgment.

Veronica Rivas-Molloy
Justice

Panel consists of Chief Justice Adams and Justices Countiss and Rivas-Molloy.

Do Not Publish. TEX. R. APP. P. 47.2(b).